CHARLES LA BELLA
KATHLEEN McGOVERN
Deputy Chiefs
THOMAS B. W. HALL
Trial Attorney
Fraud Section, Criminal Division
U.S. Department of Justice
1400 New York Avenue, NW
Washington, DC 20530
(202) 616-1682

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA
## -oOo-

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO. 2:13-cr-00018-JCM-GWF |
| | ) | |
| Plaintiff, | ) | **MOTION FOR ORDER TO DISCLOSE** |
| | ) | **FINANCIAL AFFIDAVIT OF** |
| v. | ) | **DEFENDANT DAVID BALL** |
| | ) | |
| DAVID BALL, | ) | |
| | ) | |
| Defendant. | ) | |

## I.  INTRODUCTION

Based in part on information obtained from Defendant David Ball's ex-wife, the United States has reason to believe that Defendant Ball made material false statements on his financial affidavit submitted to this Court in connection with the above-captioned matter. Therefore, the United States respectfully moves for an order to disclose the financial affidavit of Defendant Ball.

## II.     FACTUAL BACKGROUND

On January 15, 2013, a grand jury sitting in the District of Nevada returned an indictment against Defendant David Ball which alleged that he participated in a massive conspiracy to take over homeowners' associations ("HOAs") in the Las Vegas area and award certain HOA legal and construction work to co-conspirators. (Doc. No. 1.) Defendant Ball was charged with one

count of conspiracy to commit wire and mail fraud and one count of mail fraud. (*Id.*) The next day, Defendant Ball signed, submitted, and attested to a financial affidavit, upon which the Court relied when it appointed CJA counsel to represent Defendant Ball. (Doc. No. 42.)

On January 29, 2014, investigators interviewed Defendant Ball's ex-wife, Eleanor Ball.[1] Ms. Ball told investigators that the evening of Defendant Ball's initial appearance (*i.e.* January 16, 2013), an officer of Pre-Trial Services called Ms. Ball to verify certain information previously provided by Defendant Ball. Ms. Ball told the Pre-Trial officer, *inter alia*, that to her knowledge Defendant Ball was employed at Eldorado Resorts Company in real estate sales. When Defendant Ball arrived home that same evening, Ms. Ball told Defendant Ball about what she told Pre-Trial Services, Defendant Ball became angry and said in substance "I will lose my free lawyer." The next morning, Defendant Ball called Pre-Trial Services and told them that Ms. Ball's statements about his employment were incorrect.

Ms. Ball also informed the investigators that Defendant Ball had received significant benefits from the Department of Veterans Affairs before and after his indictment, including a $34,000 lump sum payment in October 2013. Ms. Ball did not believe Defendant Ball had reported this change in financial circumstances to the Court, and believed he may have concealed these payments from Pre-Trial Services altogether.

The United States has subsequently obtained records from Defendant Ball's employer, indicating that he began working at Eldorado Resorts Company in June 2012, seven months prior to his indictment and initial appearance.

## III.   ARGUMENT

### A.   It Is Lawful for the Court to Order Disclosure of Financial Affidavits Under These Circumstances

Submitting a materially false financial affidavit to the Court under penalty of perjury is a crime. *See United States v. McNeil*, 362 F.3d 570, 573 n.2 (9th Cir. 2004) ("Submitting a false

---

[1] Defendant Ball and Ms. Ball were divorced on October 21, 2013. A copy of the Clark County Family Court docket related to their divorce is attached as Exhibit A.

2

CJA-23 form may subject a defendant to criminal liability under other statutes, for example, under 18 U.S.C. § 1621, the general statute on perjury, or 18 U.S.C. § 1623, which punishes the making of a false material declaration in any proceeding before, or ancillary to, any court."). Courts in the Ninth Circuit have made the financial affidavit available to government prosecutors where there is evidence that the defendant lied on the affidavit. *Cf. United States v. Hernandez-Ramirez*, 254 F.3d 841, 842-843 (9th Cir. 2001) (finding obstruction enhancement appropriate where defendant failed to disclose certain ownership interests on financial affidavit seeking appointed counsel, demonstrating prosecution obtained underlying financial affidavit). The United States will be unable to prosecute this potential crime without access to the financial affidavit itself.

In *Seattle Times v. United States*, in considering the government's motion to unseal financial records, the Ninth Circuit set forth the standard for analyzing whether financial affidavits should remain under seal, holding that the accused must be faced with substantial hazards of self-incrimination that are "real and appreciable" and not merely "imaginary and unsubstantial." *Seattle Times v. United States,* 845 F.2d 1513, 1518 (9th Cir.1988) (citing *United States v. Neff,* 615 F.2d 1235, 1239 (9th Cir.1980)). This is not a case where the requested disclosure of the Defendant's financial affidavit implicates the Defendant's Fifth Amendment rights. *Contrast Seattle Times,* 845 F.2d at 1518 (granting order to unseal financial affidavits) *with United States v. Hickey*, 997 F.Supp. 1206 (N.D. Cal. 1998) (refusing to unseal financial affidavits). In *Hickey*, the defendants were charged with wire fraud, mail fraud, and securities fraud. The court denied the government's motion to disclose the defendants' financial affidavits because "the Defendants' financial affidavits contain information regarding Defendants' financial status, which is directly relevant to the charges against them. Thus, Defendants are faced with substantial and real hazards of incrimination should the Court unseal the financial affidavits." *Id.* at 1208. Significantly, in *Hickey*, the government sought to discover and use information contained in the affidavits as part of the case in chief in the then-indicted case. That is not the case here. In contrast, here, the Government seeks the disclosure of information

3

regarding the Defendant's reported employment status to investigate possible false statements to the Court. Unlike *Hickey*, disclosure of the employment information requested by the Government is not related to the merits of the underlying case, and therefore, does not implicate the Defendant's Fifth Amendment rights.

### B.   The Federal Marital Privileges Do Not Apply

Although the United States obtained information supporting this motion from Defendant Ball's ex-wife based in part on communications between Defendant Ball and his ex-wife during their marriage, the marital privileges do not apply in this case, and should not prevent the Court from granting the instant motion. Federal courts long have recognized two distinct privileges arising from the marriage relationship: (1) the adverse spousal testimony privilege and (2) the confidential communications privilege. Neither the adverse spousal testimonial privilege nor the marital communications privilege bars use of the statements made by Ms. Ball to Government investigators for the purpose of this motion. The adverse spousal testimonial privilege exists only *during* the marriage; because the Balls are divorced, this privilege is no longer at issue. Moreover, the adverse spousal testimonial privilege is held by the witness, meaning Ms. Ball can make a unilateral decision to waive the privilege over the Defendant Ball's objection. The marital communications privilege bars *testimony* concerning private communications between spouses during the course of the marriage; it does not apply to statements made in furtherance of the Government's investigation.

### 1.   Federal Courts Apply Federal Common Law on Privileges, Not State Law

In federal court, questions of privilege are governed by Rule 501 of the Federal Rules of Evidence which, in turn, is construed "in the light of the court's reason and experience," Fed. R. Evid. 501, and federal common law. *Trammel v. United States*, 445 U.S. 40, 47 (1980). State statutes and case law do not control in a federal criminal action. *United States v. Gillock*, 445 U.S. 360, 368 (1980); *see also United States v. Roberson*, 859 F.2d 1376, 1378 (9th Cir. 1988);

1    *In re Fischel*, 557 F.2d 209, 211 (9th Cir. 1977) (holding federal, not state, law governs the

2    attorney-client privilege in a federal criminal proceeding).

3              **2.        The Adverse Spousal Testimony Privilege Does Not Apply Here**

4              The privilege against adverse spousal testimony allows a person who is subpoenaed as a

5    witness in a criminal proceeding to refuse to testify against his or her spouse. *See Trammel* 445

6    U.S. 40 at 53 (1980). There are important distinctions between this privilege and the marital

7    communications privilege. First, it inures only to the benefit of the person who is subpoenaed –

8    the spousal privilege cannot be claimed by the non-testifying spouse. The person called to testify

9    can make a unilateral decision to invoke or waive the privilege, and can do so over the other

10   spouse's objection. *See id.* (concluding that "the witness-spouse alone has a privilege to refuse to

11   testify adversely; the witness may be neither compelled to testify nor foreclosed from

12   testifying"). Second, the parties must be married at the time of the testimony for the privilege to

13   be successfully invoked – a witness cannot claim a privilege to withhold testimony against a

14   former spouse. *See United States v. Vo*, 413 F.3d 1010, 1016 (9th Cir. 2005) (the spousal

15   privilege "permits a witness to refuse to testify against his or her spouse *while they are married*")

16   (emphasis added)). Third, it is only the spouse's testimony in the courtroom that is prohibited.

17   *Trammel*, 445 U.S. at 53 n.12 (1980)  (asserting that no privilege "prevents the Government from

18   enlisting one spouse to give information concerning the other or to aid in the other's

19   apprehension"); *United States v. Lefkowitz*, 464 F. Supp. 227, 233 n.3 (C.D. Cal. 1979) ("[T]he

20   marital privilege is inapplicable here since the spouse/informant has not testified, but rather has

21   only provided information to a government agency.")

22             Statements made by the Defendant's wife to the government investigators are not subject

23   to the adverse spousal testimony privilege. First, the Defendant and his wife were no longer

24   married on January 29, 2014, at the time she was interviewed by the Government's investigators.

25   Second, the witness-spouse alone has a privilege to refuse to testify adversely, which means that

26   Ms. Ball could unilaterally waive any privilege that exists. Third, the privilege does not apply to

     out-of-court statements made in the course of a Government investigation. Thus, the adverse

spousal testimony privilege does not apply to Ms. Ball's statements to the government investigators.

### 3.      The Confidential Communications Privilege Does Not Apply Here

The marital communications privilege protects private communications between spouses that are made during the course of the marriage. *See United States v. Banks*, 556 F.3d 967, 972 (9th Cir. 2009). There are three elements to the marital communications privilege. The substance of the communications must: (1) be intended as communication to the other spouse; (2) be made during a valid marriage; and (3) be confidential. *See United States v. Griffin*, 440 F.3d 1138, 1143 (9th Cir. 2006); *United States v. Marashi*, 913 F.2d 724, 729-30 (9th Cir. 1990). Unlike the adverse spousal testimony privilege, either spouse – the witness on the stand or the non-testifying spouse – may invoke the privilege. *See United States v. Montgomery*, 384 F.3d 1050, 1058-59 (9th Cir. 2004) (holding that "either spouse may assert the privilege to prevent testimony regarding communications between spouses"). The marital communications privilege survives the termination of the marriage. *See United States v. Bolzer*, 556 F.2d 948, 951 (9th Cir. 1977) (citing *Pereira v. United States*, 347 U.S. 1, 6 (1954)). Like the adverse spousal testimony privilege, the confidential communications privilege applies only to *testimony*, not to statements made in the course of an investigation. This privilege bars "*testimony* concerning intra-spousal, confidential expressions arising from the marital relationship." *Bolzer*, 556 F.2d at 951 (emphasis added). The Ninth Circuit "construe[s] the marital communications privilege narrowly, to promote marriage without thwarting the administration of justice." *Vo*, 413 F.3d at 1016.

The marital communications privilege is construed as "a rule of evidence … prescrib[ing] only the admission into evidence, either directly or indirectly, of confidential marital communications." *United States v. Harper*, 450 F.2d 1032, 1045-1046 (5th Cir. 1971). Accordingly, courts have consistently held that police may use confidential marital communications to investigate crimes, particularly when one spouse volunteers the information. *See, e.g., In re Grand Jury Investigation of Hugle*, 754 F.2d 863, 866 (9th Cir. 1985) (denying

request that the government and its investigators be enjoined from interrogating the defendant's wife and holding that the confidential communications privilege "relates only to testimony in judicial or grand jury proceedings"); *Harper,* 450 at 1046 (concluding the government did not violate the privilege for confidential marital communications when it used the defendant's wife's statements as basis for its investigation of defendant's illegal activities and did not attempt to introduce the statements into evidence at trial); *United States v. Giavasis,* 805 F.2d 1037, 1986 WL 18086 at *3 (6th Cir. 1986) (*per curiam*) ("Privileges, of course, only protect against the disclosure of marital confidences in *testimony*, not cooperation with law enforcement officials" (emphasis added)); *United States v. Carlson*, 946 F. Supp. 2d 1115, 1126-28 (D. Or. 2013) (holding that the marital communications privilege does not prevent government from enlisting one spouse to give information concerning the other or to aid in the other's apprehension and finding that "the very concept of 'privileged information' is intrinsically linked to court proceedings: the disclosure of the same information outside of a courtroom – for example, to a police officer – is most accurately described as a breach of confidentiality, not as a violation of privilege"); *United States v. Winfree,* 170 F.Supp. 659, 660 (E.D. Pa. 1959) (holding that information volunteered by a spouse in an extrajudicial investigation was not improperly obtained).

In the present case in the Government did not call Mrs. Ball as a witness and elicit from her confidential statements made to her by Defendant Ball. The only use made by the Government of Mrs. Ball's statements is in the instant motion. Even if Ms. Ball's statements to investigators included recitations of confidential communications with Defendant Ball, the marital privileges do not prevent Government investigators from using confidential information obtained from spouses in their investigations. *Carlson*, 946 F. Supp. 2d at 1126 n.9 (citing Trammel, 445 U.S. at 52 n.12).

**C.     Even if State Law Were To Apply, NRS § 49.295 Does Not Apply Here**

Even if the Court were to apply state law to these facts, the Nevada statutory state law marital privileges do not apply. As to the adverse spousal testimonial privilege, the statute

7

provides that "[a] husband cannot be examined as a witness for or against his wife without his consent, nor a wife for or against her husband without her consent." NRS § 49.295(1)(a). At the time Ms. Ball was interviewed by federal agents, she was not Defendant Ball's wife, and thus even had she been "examined as a witness," NRS § 49.295(1)(a) does not apply.

As to the confidential communications privilege, the Nevada statute provides that "[n]either a husband nor a wife can be *examined*, during the marriage or afterwards, without the consent of the other, as to any communication made by one to the other during marriage." NRS § 49.295(1)(b) (emphasis added). Following the federal courts' approach to this issue, the Nevada Supreme Court has held that the term "examined" under NRS § 49.295 does not encompass statements given to investigators. *See Shults v. State,* 96 Nev. 742, 747 (1980) (finding that where defendant's wife was interviewed by police detectives, "she was not actually 'examined' as contemplated by the statute"). Therefore, even if the Court were to apply state law, the state law marital privileges do not apply.

## IV.  CONCLUSION

For the foregoing reasons, the United States respectfully requests that the Court order the Pre-Trial Services office to provide the United States with a copy of Defendant Ball's financial affidavit and any records of calls between the Pre-Trial Services office and Defendant Ball and/or Ms. Ball in January 2013.[2]

/

/

/

/

/

---

[2]     If the Court is concerned that portions of Defendant Ball's financial affidavit unrelated to his employment status could be prejudicial against him in weighing the *Seattle Times* test discussed *supra*, the Court could order the disclosure of a redacted portion of the affidavit, disclosing only the name/personal information of the affiant, the section on current employment, and the signature section.

DATED:      March 3, 2014

Respectfully submitted,


JEFFREY KNOX
Chief, U.S. Department of Justice
Fraud Section, Criminal Division

*/s/ Thomas B.W. Hall*
THOMAS B.W. HALL
Trial Attorney, U.S. Department of Justice
Criminal Division, Fraud Section

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA
-oOo-

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CASE NO. 2:13-cr-00018-JCM-GWF |
| | ) |
| DAVID BALL, | ) |
| | ) **CERTIFICATE OF SERVICE** |
| | ) |
| Defendant. | ) |
| | ) |

I, the undersigned, hereby certify that this pleading was filed with the clerk of court via ECF and will be served electronically via ECF on all parties that have entered their appearances in this case.

Dated: March 3, 2014

JEFFREY H. KNOX
Chief, U.S. Department of Justice,
Fraud Section, Criminal Division

*/s/ Thomas B.W. Hall*
THOMAS B.W. HALL
Trial Attorney, U.S. Department of Justice,
Criminal Division, Fraud Section